**WELLS DAIRY, INC., Plaintiff,**

v.

**TRAVELERS INDEMNITY COMPANY OF ILLINOIS, Travelers Insurance Company, and Travelers Property Casualty Corporation, Defendants.**

**No. C01–4097MWB.**

United States District Court,
N.D. Iowa,
Western Division.

Jan. 31, 2003.

Marvin S. Berenstein, Richard H. Moeller, Berenstein, Moore, Berenstein, Heffernan & Moeller, LLP, Sioux City, IA, Mary Rose Alexander, Rene M. Devlin, Arthur F. Foerster, Adam S. Ryan, Latham & Watkins, Chicago, IL, for Wells Dairy Inc.

Jaki K. Samuelson, Whitfield & Eddy, PLC, Des Moines, IA, Steven E. Goldman, Frank F. Coulom, Jr., Gerald P. Dwyer, Jr., Robinson & Cole, LLP, Hartford, CT, for Travelers Indemnity Co. of Ill., Travelers Ins. Co.

## MEMORANDUM OPINION AND ORDER REGARDING PARTIES' CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND APPEAL OF MAGISTRATE'S ORDER DENYING MOTION FOR A PARTIAL STAY

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. INTRODUCTION .................................................... 950
 A. Procedural Background ............................................. 950
 B. Factual Background ............................................... 951

II. LEGAL ANALYSIS .................................................. 955
 A. Motion to Strike ................................................. 955

 B. *Standards For Summary Judgment* ....................................958
 C. *General Insurance Principles* ........................................959
 *1.* *Interpretation of policy language* .............................959
 *2.* *An Insurer's general duty to defend* .........................962
 D. *Coverage Under Travelers's Insurance Policies* ........................963
 *1.* *The CGL coverage part of the primary policy* ........................963
 *a.* *Claims for covered property damage* ...........................963
 *b.* *Exclusions to coverage* ......................................966
 *2.* *The Umbrella policy* .........................................967
 E. *Travelers's Duty To Defend Wells* ...................................967
 *1.* *An Insurer's general duty to defend* .........................967
 *2.* *Travelers's duty to defend here* .............................968
 F. *Wells's Bad Faith Claim* ...........................................968
 G. *Proper Defendants* .................................................973
 H. *Appeal Of Magistrate's Order Denying Motion For Partial Stay* ...........975

III. *CONCLUSION* ...............................................................977

## I. INTRODUCTION

### A. Procedural Background

On August 7, 2001, plaintiff Wells Dairy, Inc. ("Wells") filed this lawsuit in the Iowa District Court In And For Plymouth County against several of its insurers, Travelers Indemnity Company of Illinois, Travelers Insurance Company, and Travelers Property Casualty Corporation (collectively "Travelers" unless otherwise indicated). Travelers removed this case to this court on September 13, 2001, pursuant to 28 U.S.C. § 1441. On January 17, 2002, Wells filed an amended complaint. On September 5, 2002, Wells filed a second amended complaint. In its second amended complaint, Wells asserts claims for breach of contract, declaratory judgment, promissory estoppel and bad faith against Travelers. Specifically, Wells asserts that Travelers has breached a commercial general liability policy, a commercial excess insurance policy, and a deluxe income business policy by failing to defend or agree to indemnify Wells against claims made by two customers, Pillsbury Company ("Pillsbury") and Eskimo Pie Corporation ("Eskimo Pie"), resulting from an explosion and fire that occurred at Wells's South Ice Cream Plant in Le Mars, Iowa, on March

27, 1999. Wells also seeks declarations that Travelers has an obligation under the policies to defend Wells against lawsuits brought by Pillsbury and Eskimo Pie. Wells further asserts a claim of promissory estoppel based on Travelers's representations that certain costs would be covered as "extra expenses" under the Business Income Policy. Finally, Wells contends that Travelers acted in bad faith in failing to afford Wells any defense in the litigation with Eskimo Pie and Pillsbury.

On July 17, 2002, Travelers filed a motion for partial summary judgment. In its motion, Travelers moves for summary judgment on the claims alleged in Counts I, II, IV, V, and VII of the amended complaint.[1] On August 30, 2002, Wells filed its motion to strike the affidavit of Richard Jensen and cross-motion for partial summary judgment. In its motion for partial summary judgment, Wells seeks summary judgment on its claims alleged in Counts I, II, and part of Counts IV, V, and VIII of the second amended complaint on the ground that Travelers is obligated as a matter of law to defend Wells in the underlying lawsuits. The parties subsequently filed their respective resistances. O n August 30, 2002, Wells filed its Motion

---

**1.** The second amended complaint contains the same claims.

For A Partial Stay, requesting the court to stay discovery and adjudication of all aspects of this case other than those issues raised in the parties' cross-motions for partial summary judgment regarding Travelers's duty to defend. In its motion, Wells contends that an insured should not be required to litigate issues of indemnity in a declaratory judgment action with its insurer while engaged in litigation with entities asserting legal claims against it. On September 27, 2002, United States Magistrate Judge Paul A. Zoss denied Wells's Motion For A Partial Stay, concluding that Wells had failed to establish an adequate basis for the requested stay. On October 11, 2002, Wells filed an appeal of Judge Zoss's order denying Wells's Motion For A Partial Stay. In the alternative, Wells filed a motion to bifurcate. Travelers filed a resistance to Wells's appeal and alternative motion to bifurcate on October 29, 2002.

Pursuant to the parties' requests, the court held oral arguments on the parties' respective cross-motions for summary judgment and Wells's appeal of Judge Zoss's denial of Wells's Motion For A Partial Stay on January 21, 2003. At the oral arguments, plaintiff Wells was represented by Mary Rose Alexander and Adam S. Ryan of Latham & Watkins, Chicago, Illinois, and Richard H. Moeller of Berenstein, Moore, Berenstein, Heffernan & Moeller, L.L.P., Sioux City, Iowa. Defendant Travelers was represented by Stephen G. Goldman and Gerald P. Dwyer, Jr. of Robinson & Cole, L.L.P., Hartford, Connecticut, and Jaki K. Samuelson of Whitfield & Eddy, P.L.C., Des Moines, Iowa. The parties have filed thorough and extensive briefs in support of their respective positions and the oral arguments were among the finest this court has ever heard. The court turns first to Wells's motion to strike the affidavit of Richard Jensen. Upon resolution of that motion, the court

will turn to a discussion of the undisputed facts as shown by the record, then to the standards applicable to motions for summary judgment and, then, to the legal analysis of whether either of the parties are entitled to summary judgment on any of the claims at issue in this litigation. Finally, the court will consider Wells's appeal of Judge Zoss's decision on Wells's Motion For A Partial Stay, and Wells's alternative motion to bifurcate.

### B. Factual Background

The following facts are undisputed. Wells Dairy, Inc. is a manufacturer of dairy products and frozen deserts including ice cream. Wells is incorporated under the laws of the State of Iowa, and has its principal place of business in Le Mars, Iowa.

Travelers issued a primary insurance policy ("Primary Policy") and a commercial excess insurance policy ("Umbrella Policy") to Wells for the period of September 15, 1998 to September 15, 2001. The Primary Policy includes a commercial general liability coverage part ("CGL coverage part") and a first-party property damage part ("property coverage part"). The CGL coverage part, subject to its terms and conditions, provides liability coverage, for among other things, "bodily injury," "property damage," "advertising injury" and "personal injury."

The CGL coverage part provides coverage for "property damage" pursuant to the following clause:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking

damages for "bodily injury" or "property damage" to which this insurance does not apply.

Defendants' App. at 123.

Property damage is defined under the CGL coverage part as:

 a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

 b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Defendants' App. at 122. The CGL coverage part also contains a number of exclusions under which the insurance policy does not apply. Section I(2)(b) of the CGL coverage part excludes coverage for certain contractual liability:

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

 (1) Assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

 (2) That the insured would have in the absence of the contract or agreement.

Defendants' App. at 112.

Section j of the CGL coverage part excludes, in pertinent part coverage for:

"Property damage" to:

 (1) Property you own, rent, or occupy;

 . . .

 (4) Personal property in the care, custody or control of the insured;

Defendants' App. at 114. Section I(m) of the CGL coverage part excludes coverage for:

 m. Damage to Impaired Property or Property Not Physically Injured.

"Property damage" to "impaired property" or property that has not been physically injured arising out of:

 (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

 (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

Defendants' App. at 114.

The umbrella policy, like the CGL coverage part, provides liability coverage for, among other things, "bodily injury," "property damage," "advertising injury" and "personal injury." Defendants's App. at 157. The Umbrella Policy provides coverage for property damage pursuant to the following insuring clause:

We will pay on behalf of the insured the "ultimate net loss" in excess of the "applicable underlying limit" which the insured becomes legally obligated to pay as damages because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this insurance applies.

Defendants' App. at 157. The umbrella policy defines "property damage" as follows:

"Property damage" means physical injury to tangible property, including all resulting loss of use of that property.

Defendants' App. at 165.

Like the CGL coverage part, the umbrella policy contains a number of exclusions under which the insurance policy does not apply. Section I(m) of the umbrella policy excludes coverage for:

> m. "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
>
> (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
>
> (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

Defendants' App. at 160. The umbrella policy defines "impaired property" as follows:

> "Impaired property" means tangible property other than "your product" or "your work," that cannot be used or is less useful because:
>
> a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
>
> b. You have failed to fulfill the terms of a contract or agreement...

Defendants' App. at 165.

An endorsement to the umbrella policy entitled "EXCLUSION–REAL AND/OR PERSONAL PROPERTY" provides that:

> ...this insurance does not apply to "property damage" to:
>
> 1. property you own, rent, or occupy;

> 2. property loaned to you; or
>
> 3. property in your care, custody, or control.
>
> Parts 2. and 3. above do not apply to liability assumed under a sidetrack agreement.

Defendants' App. at 167.

On March 27, 1999, an explosion and resulting fire damaged Wells's South Ice Cream Plant in Le Mars, Iowa. At the time of the explosion and fire, Wells was under contract to manufacture and package ice cream products for Eskimo Pie and Pillsbury, among others. Both Eskimo Pie and Pillsbury claimed damages resulting from the explosion and fire at Wells's plant. Eskimo Pie and Pillsbury each subsequently brought suit against Wells in the United States District Court for the Northern District of Iowa ("the underlying lawsuits").

On June 5, 2000, the first of the underlying lawsuits was filed, *CGU Ins. Co. v. Wells Dairy, Inc.,* C00–4056–MWB (N.D.Iowa), in which CGU Insurance Company ("CGU") sued Wells as the subrogee of Eskimo Pie ("the Eskimo Pie Lawsuit"). The Eskimo Pie Lawsuit complaint alleges in part that on or before March 27, 1999, Eskimo Pie delivered to Wells "various ingredients, packaging, materials and special components to be used by [Wells] in the manufacture of products for Eskimo Pie." Defendants' App. at 28. Count I of the complaint in the Eskimo Pie Lawsuit alleges that Wells breached its obligations under its ice cream manufacturing contract with Eskimo Pie on the following grounds:

(a) Defendant failed to have and/or maintain adequate machinery and equipment for the production of the product;

(b) Defendant failed to comply with the warranties and guarantees made in the Contract;

(c) Defendant failed to operate and maintain a modern manufacturing facility;

(d) Defendant failed to assume full responsibility and liability for the losses;

(e) Defendant failed to reimburse Eskimo Pie for the losses sustained and claimed by Plaintiff.

Defendants' App. at 29. In Count II, it is alleged that Wells was negligent, careless or reckless in the following ways:

(a) failing to purchase, design or specify an appropriate freezer system;

(b) failing to properly inspect, service, and/or maintain the freezer system;

(c) failing to act when it knew or should have known of an incipient malfunction of the freezer system;

(d) failing to act when it knew or should have known of an ammonia hammer within the freezer system;

(e) improperly running a hot gas defrost cycle of the freezer system;

(f) failing to upgrade the freezer system with appropriate safeguards to prevent the danger of explosion.

Defendants' App. at 29. The Eskimo Pie Lawsuit complaint further alleges that as a result of the March 27, 1999, fire and explosion:

Eskimo Pie sustained damages to ingredients, packaging, materials and special components, damages for monies expended in promotion, and damages of anticipated loss of revenues from product sales, the aforesaid damages exceeding $75,000.

Defendants' App. at 29. On October 23, 2000, CGU withdrew the Eskimo Pie Lawsuit without prejudice.

On July 17, 2000, Pillsbury's parent company filed *Diago, P.L.C. v. Wells Dairy, Inc.*, C00–4078–MWB (N.D.Iowa), and amended the lawsuit on August 30, 2000 to substitute Pillsbury as the named plaintiff ("the Pillsbury Lawsuit"). The complaint in the Pillsbury Lawsuit sets out two causes of action, one for breach of contract and one for negligence. Count I of the complaint in the Pillsbury Lawsuit alleges that Wells breached its obligations under its ice cream manufacturing contract with Pillsbury on the following grounds:

(a) Defendant failed to have the equipment, facilities and personnel necessary and suitable to manufacture the product;

(b) Defendant failed to operate its facility in accordance with applicable law;

(c) Defendant failed to reimburse Plaintiff for the losses sustained and claimed by Plaintiff; and;

(d) Defendant failed to indemnify Plaintiff for the losses sustained and claimed by Plaintiff.

Defendants' App. at 46.

In Count II, it is alleged that Wells was negligent, careless or reckless in the following ways:

(a) failing to purchase, design or specify an appropriate freezer/production system;

(b) failing to properly inspect, service, and/or maintain the freezer/production system;

(c) failing to act when it knew or should have known of an incipient malfunction of the freezer/production system;

(d) failing to act when it knew or should have known of an ammonia hammer within the freezer/production system;

(e) improperly running a hot gas defrost cycle of the freezer/production system;

(f) failing to upgrade the freezer/production system with appropriate safeguards to prevent the danger of explosion.

Defendants' App. at 47.

The Pillsbury Lawsuit complaint alleges that Pillsbury sustained "damage to [Pillsbury's] property and loss of revenues..." Defendants' App. at 46. The complaint, however, does not reference or describe any alleged physical injury to Pillsbury's tangible property or any alleged loss of use of any tangible property. Pillsbury's reference to "damage to Plaintiff's property" in paragraph 18 of the First Amended Complaint relates entirely to $24,821.40 in expenses incurred by Pillsbury to have consultants inspect the site of the explosion and advise Pillsbury about the explosion's impact on Pillsbury's business. Pillsbury is seeking the recovery of these consulting expenses. Pillsbury, however, has not sustained any loss of use of its tangible property as a result of the explo-

sion. Pillsbury is not seeking damages in the Pillsbury Action for physical injury to or loss of use of its tangible property. The Pillsbury Lawsuit complaint further alleges that: "As a result of the aforementioned explosion, Plaintiff sustained damages from loss of revenues from product sales, the aforesaid damages exceeding $75,000.00." Defendants' App. at 45.

Wells tendered the underlying lawsuits to Travelers seeking a defense and coverage. Travelers denied coverage and any obligation to defend the underlying lawsuits.

## II. LEGAL ANALYSIS

### A. Motion to Strike

Before the court can consider the merits of the parties' summary judgment motions, the court must first consider the preliminary matter of Wells's motion to strike the affidavit of Richard Jensen in its entirety.[2]

**2.** Jensen avers in his affidavit that:

1. I am currently an Engineering Manager with General Mills, Inc., the successor in interest to the Pillsbury Company ("Pillsbury"), and have been employed in this capacity for the past six months. Prior to my position with General Mills, Inc., I was an Engineering Manager with Pillsbury for eleven and one-half years. My duties in these two positions include overseeing capital planning and execution in support of business goals.

2. The matters set forth herein are based on my personal knowledge.

3. In my position as Engineering Manager, I am the person most knowledgeable about the existence or non-existence of any claims of Pillsbury against Wells' Dairy Inc. ("Wells' Dairy") for physical injury to or loss of use of Pillsbury's tangible property arising out of the March 27, 1999 explosion and fire that occurred at the ice cream production facility owned and operated by Wells' Dairy and located at 1191 18th Street S.W. in LeMars, Iowa ("the explosion.").

4. In particular, I am the person most knowledgeable about the facts underlying

Pillsbury's reference to "damage to Plaintiff's property" in paragraph 18 of Pillsbury's First Amended and Substituted Complaint and Jury Demand ("First Amended Complaint") filed in the Civil Action No. 00–4078–MWB, in the United States District Court for the Northern District of Iowa, entitled *The Pillsbury Company v. Wells Dairy, Inc.* ("the Pillsbury Action"). I attach, as Exhibit A, a true and correct copy of the First Amended Complaint.

5. In the Pillsbury Action, Pillsbury's reference to "damage to Plaintiff's property" in paragraph 18 of the First Amended Complaint relates entirely and solely to the $24,821.40 in expenses incurred by Pillsbury to have consultants inspect the site of the explosion and advise Pillsbury about the explosion's impact on Pillsbury's business. Pillsbury is seeking the recovery of these consulting expenses in the Pillsbury Action. Pillsbury, however, has not sustained any loss of use of its tangible property as a result of the explosion. Pillsbury, therefore, is not seeking damages in the Pillsbury Action for physical injury to or loss of use of its tangible property.

This is so, because the motion to strike goes to what record the court can consider in its resolution of the parties' cross-motions for partial summary judgment.

Wells seeks to strike the affidavit of Richard Jensen on three grounds: (1) that the affidavit is self-serving; (2) that the affidavit is not in the record of the Pillsbury Lawsuit; and, (3) that the affidavit merely contains legal conclusions. The court recognizes that an affidavit which fails to meet the standards of Rule 56(e) of the Federal Rules of Civil Procedure is subject to a motion to strike. Federal Rule of Civil Procedure 56(e) provides:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

FED. R. CIV. P. 56(e).

■■■ Jensen's affidavit was filed in support of Travelers's motion for partial summary judgment, and as such, it must comport with the requirements of the Federal Rules of Civil Procedure. Rule 56(e) of the Federal Rules of Civil Procedure provides that an affidavit in support of a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e). Because affidavits proffered in support of a motion for summary judgment must be based upon personal knowledge, an affidavit based upon "information and belief" is insufficient as a matter of law. *Automatic Radio Mfg. Co. v. Hazeltine Research,* 339 U.S. 827, 831, 70 S.Ct. 894, 94 L.Ed. 1312 (1950) (affidavit in support of motion for summary judgment made on information and belief does not comport with Rule 56(e)); *accord Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639 (2d Cir. 1988); *Tavery v. United States,* 32 F.3d 1423, 1426 n. 4 (10th Cir.1994). Furthermore, the court may consider only that evidence that would be admissible at trial. *Samuels v. Doctors Hosp., Inc.,* 588 F.2d 485, 486 n. 2 (5th Cir.1979). Hearsay statements which cannot be categorized as a hearsay exception, conclusory allegations, legal arguments, and statements not based upon personal knowledge, may be stricken. *See Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) (lack of personal knowledge); *Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986) (conclusory allegations and legal arguments).

■■■ With respect to the first argument, the court does not find that the Jensen affidavit is self-serving. Courts have recognized that "conclusory allegations and self-serving affidavits, without support in the record, do not create a

Defendants' App. at 172–73.

triable issue of fact." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir.2002) (citing *Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 724 (7th Cir.1998)); *accord Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir.2001); *see Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir.1998); *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995); *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir.1993). Jensen is currently employed by Pillsbury's successor in interest and was employed by Pillsbury for eleven and one-half years as an engineering manager. Jensen's affidavit acknowledges limits on the types of damages that Pillsbury is seeking from Wells. While such averments may be beneficial to Travelers, they do not benefit Pillsbury and therefore cannot be considered self-serving. Therefore, the court denies this portion of Wells's motion to strike.

■ Wells also seeks to have the Jensen affidavit stricken on the ground that it is not in the record of the underlying lawsuit between Pillsbury and Wells. This court has noted that:

> An insurer has a duty to defend whenever there is potential or possible liability to indemnify the insured based upon the facts appearing at the outset of the case. *First Newton Nat'l Bank v. General Casualty Co. of Wis.*, 426 N.W.2d 618, 623 (Iowa 1988) (citing *McAndrews v. Farm Bureau Mut. Ins. Co.*, 349 N.W.2d 117, 119 (Iowa 1984)); *see also Yegge v. Integrity Mut. Ins. Co.*, 534 N.W.2d 100, 102 (Iowa 1995) (duty to defend whenever potential liability to indemnify based upon facts appearing at outset of the case; however, duty to defend and duty to indemnify are co-extensive duties in that there is no duty to defend unless there is a duty to indemnify); *Essex Ins. Co. v. Fieldhouse, Inc.*, 506 N.W.2d 772, 774 (Iowa 1993)

(in analyzing the potential duty to defend, which is broader than the duty to indemnify, the appropriate starting point is the allegations contained in the petition); *Weber v. IMT Ins. Co.*, 462 N.W.2d 283, 285 (Iowa 1990); *Kartridg Pak Co. v. Travelers Indem. Co.*, 425 N.W.2d 687, 688 (Iowa Ct.App.1988) (to determine whether insurer had duty to defend, court construes the policy and looks to the pleadings and all other admissible and relevant facts in the record to determine whether coverage exists under the policy). Although courts should look first and primarily to the petition for the "facts at the outset of the case," it is sometimes necessary to expand the scope of inquiry to any other admissible and relevant facts in the record. *First Newton Nat'l Bank*, 426 N.W.2d at 623 (citing *McAndrews*, 349 N.W.2d at 119).

On the other hand, an insurer is not required to provide a defense when no facts presently available to it indicate coverage of the claim, merely because such facts might later be added by amendment or introduced as evidence at the trial. *McAndrews v. Farm Bureau Mut. Ins. Co.*, 349 N.W.2d 117, 119 (Iowa 1984). Furthermore, "[t]he insurer has no duty to defend if after construing both the policy in question, the pleadings of the injured party and any other admissible and relevant facts in the record, it appears the claim made is not covered by the indemnity insurance contract." *Weber*, 462 N.W.2d at 285 (quoting *McAndrews*, 349 N.W.2d at 119, in turn, citing *Central Bearings Co. v. Wolverine Ins. Co.*, 179 N.W.2d 443, 445 (Iowa 1970)). If the totality of facts fail to disclose potential coverage, an insurer might proceed in two ways: it could initiate a declaratory judgment action against its insured, or it might elect to do nothing, running the risk, of

course, that its insured will seek indemnity if coverage is established at trial. *McAndrews,* 349 N.W.2d at 119 (citations omitted). *Coulter v. CIGNA Property & Cas. Cos.,* 934 F.Supp. 1101, 1113 (N.D.Iowa 1996). Thus, this court has previously recognized that relevant evidence outside of the complaint of the underlying lawsuit may be considered in determining whether a duty to defend and indemnify exists. *See McAndrews v. Farm Bureau Mut. Ins. Co.,* 349 N.W.2d 117, 119 (Iowa 1984) (noting that "[t]he scope of inquiry, however, must sometimes be expanded beyond the petition, especially under 'notice pleading' petitions which often give few facts upon which to assess an insurer's duty to defend."); *Central Bearings Co. v. Wolverine Ins. Co.,* 179 N.W.2d 443, 445 (Iowa 1970) (recognizing the need to supplement the facts in the pleadings saying that the insurer has no duty to defend "if after construing both the policy in question, the pleadings of the injured party and any other admissible and relevant facts in the record, it appears the claim made is not covered by the indemnity insurance contract. . . ."). Therefore, the court denies this portion of the motion to strike.

Finally, Wells seeks to strike Jensen's affidavit on the ground that the affidavit merely contains legal conclusions. The court concludes, upon review of Jensen's affidavit, that it contains admissible factual assertions regarding Pillsbury's damage claims. Jensen explains in his affidavit the factual basis underlying Pillsbury's claim for "damage to Plaintiff's property" contained in paragraph 18 of the first amended complaint in the underlying lawsuit between Pillsbury and Wells:

5. In the Pillsbury Action, Pillsbury's reference to "damage to Plaintiff's property" in paragraph 18 of the First Amended Complaint relates entirely and solely to the $24,821.40 in expenses incurred by Pillsbury to have consultants inspect the site of the explosion and advise Pillsbury about the explosion's impact on Pillsbury's business. Pillsbury is seeking the recovery of these consulting expenses in the Pillsbury Action. Pillsbury, however, has not sustained any loss of use of its tangible property as a result of the explosion. Pillsbury, therefore, is not seeking damages in the Pillsbury Action for physical injury to or loss of use of its tangible property.

Defendants's App. at 173. These allegations are factual in nature and are relevant to the dispute before the court. Jensen asserts that these allegations are based on his personal knowledge. Additionally, from the materials contained in the affidavit, Jensen is competent to testify regarding the materials contained in his affidavit. Therefore, the court denies Wells's motion to strike Jensen's affidavit.

### B. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part,* 202 F.3d 1035 (8th Cir.2000), *cert. denied,* 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd,* 205 F.3d 1347, 2000 WL 84400 (8th Cir. 2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997);

*Lockhart v. Cedar Rapids Community Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(a)-(c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Ra-*

dio Corp., 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel,* 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348; *Quick,* 90 F.3d at 1377 (same). With these standards in mind, the court turns to consideration of the parties' cross-motions for partial summary judgment.

### C. General Insurance Principles

#### 1. Interpretation of policy language

Because the issue of Travelers's duty to defend and indemnify Wells in the underlying lawsuits requires an analysis of whether the claims in those lawsuits involve "property damage," as defined in the Travelers's policies, the court must determine whether the definition of "property damage" is ambiguous as it is worded in the policy. The question of whether any term in an insurance policy is ambiguous must be determined by the standards for

determination of the ambiguity of terms in an insurance contract. The court therefore will review those standards for determining ambiguity.[3]

■■■ The standards for determination of the ambiguity of terms in an insurance contract were summarized by the Iowa Supreme Court in *Morgan v. American Family Mut. Ins. Co.*, 534 N.W.2d 92 (Iowa 1995):

> The construction and interpretation of an insurance policy is a question of law for the court to decide. *Johnson v. Farm Bureau Mut. Ins. Co.*, 533 N.W.2d 203, 206 (Iowa 1995). The policy is to be construed as a whole, giving the words used their ordinary, not technical meaning to achieve a practical and fair interpretation. *Gracey v. Heritage Mut. Ins. Co.*, 518 N.W.2d 372, 373 (Iowa 1994). When the terms of an insurance policy are ambiguous, we will construe them against the insurer. *Id.* However, the mere fact that the parties disagree on the meaning of a particular term does not establish ambiguity. *Id.* We will not give a strained or unnatural reading to the words of the policy to create ambiguity where there is none. *West Trucking Line, Inc. v. Northland*

*Ins. Co.*, 459 N.W.2d 262, 263 (Iowa 1990).

*Morgan*, 534 N.W.2d at 99. The standards stated in *Morgan* are mirrored in innumerable decisions by Iowa courts. *See, e.g., Iowa Comprehensive Petroleum Underground Storage Tank Fund Board v. Federated Mut. Ins. Co.*, 596 N.W.2d 546, 550 (Iowa 1999); *LeMars Mut. Ins. Co. v. Joffer*, 574 N.W.2d 303, 306–307 (Iowa 1998); *AMCO Ins. Co. v. Rossman*, 518 N.W.2d 333, 334 (Iowa 1994) (holding that policy terms given ordinary meaning as reasonable person would understand them, and disagreement between parties over meaning does not establish ambiguity); *Farm Bureau Mut. Ins. Co. v. Sandbulte*, 302 N.W.2d 104, 108 (Iowa 1981) (holding that disagreement between parties as to terms meaning does not establish ambiguity); *Pappas v. Bever*, 219 N.W.2d 720, 721 (Iowa 1974) (concluding that terms must be given their plain and ordinary meanings); *Tom Riley Law Firm, P.C. v. Tang*, 521 N.W.2d 758, 759 (Iowa Ct.App.1994) (disagreement of parties as to meaning does not establish ambiguity and terms must be given their ordinary meaning).

■■■ In addition to the standards set out in *Morgan*, a few other points regard-

---

3. The parties agree that the court need not make a determination as to a choice of laws in this case because there is no conflict between Iowa and Minnesota law on the issues raised by the parties' cross-motions for partial summary judgment. The court agrees that there is no "true conflict" between the law of Iowa and the law of Minnesota as to the issues before the court on the parties' cross-motions for summary judgment and therefore the court need not make a choice of law decision. *See Phillips v. Marist Soc'y*, 80 F.3d 274, 276 (8th Cir.1996) ("[B]efore entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states."); *Nesladek v. Ford Motor Co.*, 46 F.3d 734, 736 (8th Cir.1995) (first

question was whether there was a "true conflict of laws," and where there was no doubt that case presented a "true conflict," court turned to consideration of which jurisdiction's law should apply under Minnesota conflict-of-laws rules); *Cleary v. News Corp.*, 30 F.3d 1255, 1265 (9th Cir.1994) (court must first determine whether "true conflict" exists between the laws of the jurisdictions); *Harlan Feeders, Inc. v. Grand Labs., Inc.*, 881 F.Supp. 1400, 1405 (N.D.Iowa 1995) (noting that before any choice of law need be made, there must be a "true conflict" between the laws of the possible jurisdictions on the pertinent issue). Therefore, the court will apply Iowa law in addressing the issues raised by the parties' cross-motions for partial summary judgment.

ing determinations of ambiguities in insurance contracts need to be mentioned. Under Iowa contract law, " '[a]n ambiguity exists if, after the application of pertinent rules of interpretation to the policy words, a genuine uncertainty exists as to which of two or more meanings is the proper one.' " *Joffer*, 574 N.W.2d at 306 (quoting *Ferguson v. Allied Mut. Ins. Co.*, 512 N.W.2d 296, 298 (Iowa 1994)); *Jensen v. Jefferson County Mut. Ins. Ass'n*, 510 N.W.2d 870, 871 (Iowa 1994) (quoting *Connie's Constr. Co., Inc. v. Fireman's Fund Ins. Co.*, 227 N.W.2d 207, 210 (Iowa 1975)); *Motor Club of Iowa Ins. Co. v. Iowa Mut. Ins. Co.*, 508 N.W.2d 634, 636 (Iowa 1993); *A.Y. McDonald Indus., Inc. v. Insurance Co. of N. Am.*, 475 N.W.2d 607, 619 (Iowa 1991); *Iowa Fuel & Minerals v. Board of Regents*, 471 N.W.2d 859, 863 (Iowa 1991); *Nepstad Custom Homes Co. v. Krull*, 527 N.W.2d 402, 405 (Iowa Ct.App.1994); *Tom Riley Law Firm, P.C.*, 521 N.W.2d at 759 (noting that ambiguity exists when a genuine uncertainty exists over two or more meanings of the terms of the contract). The test for ambiguity is an objective one: "Is the language fairly susceptible to two interpretations?" *Joffer*, 574 N.W.2d at 308 (citing *A.Y. McDonald Indus., Inc.*, 475 N.W.2d at 619); *Met–Coil Sys. Corp. v. Columbia Casualty Co.*, 524 N.W.2d 650, 658 (Iowa 1994) (same standard) (citing *North Star Mut. Ins. Co. v. Holty*, 402 N.W.2d 452, 454 (Iowa 1987)); *Cincinnati Ins. Co. v. Hopkins Sporting Goods, Inc.*, 522 N.W.2d 837, 839 (Iowa 1994) (same standard); *Iowa Fuel*, 471 N.W.2d at 863; *North Star Mut. Ins. Co. v. Holty*, 402 N.W.2d 452, 454 (Iowa 1987) (same standard); *Sandbulte*, 302 N.W.2d at 108 (same standard); *see also Farm & City Ins. Co. v. Anderson*, 509 N.W.2d 487, 491 (Iowa 1993) (formulating the test for ambiguity in an insurance policy as "whether a reasonable person would read more than one meaning into the words," citing *Smithway Motor Xpress, Inc. v. Liberty Mut. Ins. Co.*, 484 N.W.2d 192, 194 (Iowa 1992)).

It is a "fundamental rule" for interpreting insurance policies that when the meaning of a term in an insurance policy is ambiguous, it must be construed in the light most favorable to the insured. *Cincinnati Ins. Co.*, 522 N.W.2d at 839; *AMCO Ins. Co.*, 518 N.W.2d at 334 ("When the meaning of terms of an insurance policy is susceptible to two interpretations, the one favoring the insured is adopted."); *Jensen*, 510 N.W.2d at 871; *A.Y. McDonald Indus., Inc.*, 475 N.W.2d at 619; *North Star Mut. Ins. Co.*, 402 N.W.2d at 454; *Rich v. Dyna Technology, Inc.*, 204 N.W.2d 867, 872 (Iowa 1973) ("Where insurance contracts are ambiguous, require interpretation, or are susceptible to equally proper constructions, the court will adopt the construction most favorable to the insured."); *The Travelers v. Mays*, 434 N.W.2d 133, 134 (Iowa Ct.App.1988) (quoting *Rich*). The reason underlying this rule is that insurance contracts are contracts of adhesion. *Joffer*, 574 N.W.2d at 306; *Cincinnati Ins. Co.*, 522 N.W.2d at 839; *Jensen*, 510 N.W.2d at 871; *A.Y. McDonald Indus., Inc.*, 475 N.W.2d at 619. Again, however, this rule applies only when the terms of the policy are ambiguous or unclear. *Joffer*, 574 N.W.2d at 307; *Farm & City Ins. Co.*, 509 N.W.2d at 490–91.

When interpreting insurance policies, a court must " 'seek to ascertain from its words the intent of the insurer and insured at the time the policy was sold.' " *Jensen*, 510 N.W.2d at 871 (quoting *Grinnell Mut. Reinsurance Co. v. Voeltz*, 431 N.W.2d 783, 785 (Iowa 1988)).[4]

---

4. Under Iowa law, the court, not the jury, has the duty to construe contracts. *AMCO Ins.*

### 2. An Insurer's general duty to defend

▮▮▮ Because the issue of whether Travelers had or has a duty to defend Wells is raised in Wells's motion for partial summary judgment, the court will examine Iowa law regarding an insurer's duty to defend one of its insureds. An insurer has a duty to defend whenever there is potential or possible liability to indemnify the insured based upon the facts appearing at the outset of the case. *First Newton Nat'l Bank v. General Casualty Co. of Wis.*, 426 N.W.2d 618, 623 (Iowa 1988) (citing *McAndrews v. Farm Bureau Mut. Ins. Co.*, 349 N.W.2d 117, 119 (Iowa 1984)); *see also Yegge v. Integrity Mut. Ins. Co.*, 534 N.W.2d 100, 102 (Iowa 1995) (duty to defend whenever potential liability to indemnify based upon facts appearing at outset of the case; however, duty to defend and duty to indemnify are co-extensive duties in that there is no duty to defend unless there is a duty to indemnify); *Essex Ins. Co. v. Fieldhouse, Inc.*, 506 N.W.2d 772, 774 (Iowa 1993) (noting that in analyzing the potential duty to defend, which is broader than the duty to indemnify, the appropriate starting point is the allegations contained in the petition); *Kartridg Pak Co. v. Travelers Indem. Co.*, 425 N.W.2d 687, 688 (Iowa Ct.App.1988) (to determine whether insurer had duty to defend, court construes the policy and looks to the pleadings and all other admissible and relevant facts in the record to determine whether coverage exists under the policy). Although courts should look first and primarily to the petition for the "facts at the outset of the case," it is sometimes necessary to expand the scope of inquiry to any other admissible and relevant facts in the record. *First Newton Nat'l Bank*, 426 N.W.2d at 623 (citing *McAndrews*, 349 N.W.2d at 119).

▮▮▮ On the other hand, an insurer is not required to provide a defense when no facts presently available to it indicate coverage of the claim, merely because such facts might later be added by amendment or introduced as evidence at the trial. *McAndrews*, 349 N.W.2d at 119. Moreover, the Iowa appellate courts have noted that "[t]he insurer has no duty to defend if after construing both the policy in question, the pleadings of the injured party and any other admissible and relevant facts in the record, it appears the claim made is not covered by the indemnity insurance contract." *Weber v. IMT Ins. Co.*, 462 N.W.2d 283, 285 (Iowa 1990) (quoting *McAndrews*, 349 N.W.2d at 119, in turn, citing *Central Bearings Co. v. Wolverine Ins. Co.*, 179 N.W.2d 443, 445 (Iowa 1970)). If the totality of facts fail to disclose potential coverage, an insurer might proceed in two ways: it could initiate a declaratory judgment action against its insured, or it might elect to do nothing, running the risk, of course, that its insured will seek indemnity if coverage is established at trial. *McAndrews*, 349 N.W.2d at 119 (citations omitted). With these standards in mind, the court proceeds to an analysis of the parties' arguments regarding the language

---

Co. v. Rossman, 518 N.W.2d 333, 334 (Iowa 1994); *Jensen*, 510 N.W.2d at 871; *Grinnell Mut. Reinsurance Co. v. Voeltz*, 431 N.W.2d 783, 785 (Iowa 1988). Although interpreting the meaning of words in an insurance policy is most often an issue of law for the court to decide, the interpretation becomes a question of fact where the interpretation depends on "extrinsic evidence or on a choice among reasonable inferences from extrinsic evidence." *Jensen*, 510 N.W.2d at 871; *Voeltz*, 431 N.W.2d at 785. Extrinsic evidence refers to evidence other than the words of the policy. *Jensen*, 510 N.W.2d at 871; *Voeltz*, 431 N.W.2d at 785. Although the parties may disagree on the meaning of a term, that does not establish that the term is ambiguous so as to cause an interpretation of the contract against the maker. *AMCO Ins. Co.*, 518 N.W.2d at 334.

of the Travelers's insurance policies at issue in this litigation.

### D. Coverage Under Travelers's Insurance Policies

#### 1. The CGL coverage part of the primary policy

The CGL coverage part of the Primary Policy provides that Travelers will indemnify Wells for certain liabilities that Wells incurs to third-parties for "bodily injury," "property damage," "advertising injury," and "personal injury." Only the coverage with respect to property damage is at issue before the court. Travelers contends that neither Pillsbury nor Eskimo Pie have asserted claims for property damage which would be covered under the CGL coverage part of the Primary Policy. Wells, on the other hand, asserts that the claims asserted against it in the underlying lawsuits by Pillsbury and Eskimo Pie fall within the provisions of the CGL coverage part of the Primary Policy.

#### a. Claims for covered property damage

 Wells contends that Pillsbury and Eskimo Pie assert claims against it for damages for injury to or loss of use of their own personal property. Wells contends that these claims clearly fall within the scope of the CGL coverage part of the Primary Policy. Travelers responds that the only tangible property that Pillsbury or Eskimo Pie could be seeking damages for must be either damage to personal property of Pillsbury or Eskimo Pie that was in the possession of Wells at its plant, or lost Pillsbury and Eskimo Pie profits that resulted from their inability to sell the ice cream products that Wells was unable to supply as a result of the explosion at its plant. Travelers contends that the former claims are barred under the policy's "care, custody, and control" exclusion while the latter claims are barred because they do not involve tangible property. Wells responds that Pillsbury is claiming damages for loss of use of certain equipment at its Tulare plant, "shrink" damages for the destruction or loss of use of raw materials due to decreased production, and "qualification" damages for raw materials and components lost during "qualification" of alternative production facilities made necessary due to the explosion at Wells's plant.[5] Wells also contends that certain Eskimo Pie ingredient inventory was not used and became obsolete as a result of the explosion at the Wells plant.

In the CGL coverage part of the Primary Policy, "property damage" is defined to include "the loss of use of tangible property that is not physically injured." Thus, to prevail on its claim that Travelers is obligated to defend Wells in connection with the underlying actions, Wells must establish the possibility that the injury alleged in the underlying actions constitutes "property damage" as defined in the CGL coverage part of the Primary Policy. This question turns on whether the damages allegedly suffered by Pillsbury and Eskimo Pie constitute "loss of use" damages as that term is used in the CGL coverage part of the Primary Policy.

The Third Circuit Court of Appeals has observed that:

> The classic example of a loss of use injury is a case in which a manufacturer of construction cranes sells a defective crane which collapses in front of a restaurant, thereby impairing the restau-

---

**5.** Richard Jensen indicates in his deposition that "qualification" refers to test runs conducted on a production line to ascertain whether the production from that line meets Pillsbury's specifications for a given product. Jensen Dep. at 57–58 (attached as Ex. F to Wells's Combined Reply Brief).

rant's income. If the restaurant sues the manufacturer and recovers the lost income, the manufacturer would be covered by the "loss of use" component of the CGL policy.

*Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808, 815 n. 6 (3rd Cir.1994).

The Iowa Supreme Court addressed a question similar to that presented here in *Yegge v. Integrity Mut. Ins. Co.*, 534 N.W.2d 100, 102 (Iowa 1995). In *Yegge*, an insurer, having provided a general business liability policy to a building contractor, was sued by homeowners in a dispute arising from construction of a residence. *Yegge*, 534 N.W.2d at 101. The underlying lawsuit alleged damages resulting from breach of contract, breach of express and implied warranty, negligence, and fraud against a builder. *Id.* at 102. The homeowners sought damages for cost of labor, material, and supplies necessary to complete their residence to their satisfaction, disruption of their lives, impairment of their business, increased expenses, diminished investment value, and emotional distress. *Id.* The insurer refused to defend its insured, the contractor, in the underlying lawsuit, determining that because it had no duty to indemnify on the homeowners's claims, it had no duty to defend. *Id.* at 101. The general business liability policy provided coverage for "property damage" caused by an "occurrence," as defined by the policy. The policy defined "property damage" as:

> (1) Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> (2) Loss of use of tangible property that is not physically injured.

*Id.* at 102.[6] The Iowa Supreme Court found that the subjects of the counts in the underlying lawsuit were intangible economic losses; as such, these losses did not qualify as "property damage," apparently under either definition provided in the policy. *Id.* (citing *Kartridg Pak Co. v. Travelers Indem. Co.*, 425 N.W.2d 687, 690 (Iowa Ct.App.1988)) ("intangible damages, such as diminution in value, do not constitute physical injury to or destruction of tangible property"). The court found that the underlying lawsuit was, "from beginning to end, a claim for poor performance in constructing a residence. [The homeowners] would convert a routine business liability policy into a performance bond, clearly a risk [the insurer] did not undertake." *Id.* at 103.

Here, Travelers asserts that diminution in the value of Eskimo Pie's ingredient inventory is economic loss, not property damage. There is case law from other states supporting the general premise that "[d]iminution in value-even to the point of worthlessness-is not the same as 'loss of use damages.'" *Vogel v. Russo*, 236 Wis.2d 504, 613 N.W.2d 177, 184 (2000); *see Smartfoods, Inc. v. Northbrook Prop. & Cas. Co.*, 35 Mass.App.Ct. 239, 618 N.E.2d 1365, 1368 (1993); *see also Nutmeg Ins. Co. v. Pro-Line Corp.*, 836 F.Supp. 385, 388 (N.D.Tex.1993) (holding that loss of sales of plaintiff's product did not constitute the "loss of use of tangible property" within property damage definition); *Hawaiian Ins. & Guar. Co. v. Blair, Ltd.*, 6 Haw.App. 447, 726 P.2d 1310, 1313 (1986) (holding that allegations showing diminution in value of plaintiff's "product-line" did not constitute the "loss of use of tangible property" within property damage def-

---

**6.** The definition of "property damage" in *Yagge,* is identical to the definition of "property damage" contained in the CGL coverage part of the Primary Policy at issue in this litigation.

inition). The court will briefly examine several of these cases.

In *Vogel,* plaintiff homeowners sued their builder and his insurer on grounds of negligence and breach of contract. Plaintiffs claimed that faulty masonry work damaged their new home. The builder impleaded the masonry subcontractor and its insurer which had issued a standard comprehensive general liability (CGL) policy. A jury found for the plaintiffs and awarded damages under two theories: cost of repair and diminution in value. The trial court accepted the diminution in value as the measure of damages. The Wisconsin Supreme Court reversed on the ground that most of the damages were excluded by the CGL policy. Construing the CGL coverage at issue, the court held that it applied only to the "collateral property damage associated with the defective masonry work, not the defective masonry itself, the cost to repair it, or any effect on the home's value it may have had." *Id.* at 185.

In *Smartfoods, Inc. v. Northbrook Property & Cas. Co.,* 35 Mass.App.Ct. 239, 618 N.E.2d 1365, the insured sought a declaratory judgment regarding the duty of several insurers to defend it under respective insurance policies which it argued covered various tort and contract claims brought against it by former distributors of its cheese popcorn products. With respect to the distributors' claims that they had been harmed by excess capacity in personnel and equipment, the court held that:

> Smartfoods attempts to fit into the "loss of use" category the distributors' claim that they were entitled to damages because Smartfoods' cancellation left them with surplus display racks and excess capacity in a van and five trucks bought to help handle the Smartfoods product. To cast an insufficiency of demand for the use of property to its fullest poten-

tial as a loss of use of that property is an exercise in turning language inside out. The property was there to be used. Economic loss incident to inability to exploit that available property profitably is not within the scope of property damage coverage.

*Id.* at 1368.

Wells directs the court's attention to the Third Circuit Court of Appeals's decision in *Lucker Mfg. v. Home Ins. Co.,* 23 F.3d 808, 816–17 (3rd Cir.1994). The *Lucker* case involved the issue of whether a clause providing for the "loss of use of tangible property that has not been physically injured" covered the costs of correcting a defective component part which had been designed and was to be incorporated into a product which had not yet been manufactured. The Third Circuit Court of Appeals opined that the plain language of the clause covered the decreased value of the product caused by a wrongful act not accompanied by physical injury and explained:

> The loss of a non-physical use of a product, such as offering it for sale, should be considered a "loss of use" and ... the decreased value of a product because of loss of customer acceptance of the product is a "loss of use" within the meaning of the standard CGL policy.

*Lucker,* 23 F.3d at 816. Thus, the court concluded that the loss of a product made for a particular purpose caused by a change in the customer's acceptance of it constituted a loss of use of property. The court went on to hold, however, that at the time customer acceptance was lost, the component part still was being designed and thus it was a form of intangible property which had "no intrinsic marketable value of its own," similar to "investments," "good will" or "economic interest" in the form of profits, investment value and productivity. *Id.* at 819. Because the insured

sought coverage for damages from the loss of the design itself, an intangible thing, the loss of use did not constitute covered property damage. *Id.* at 820–21.

Here, the loss of use to Eskimo Pie of tangible property, i.e., the spoilation of the perishable ingredient inventory, is manifest. It is the nature of the tangible property here, the perishable inventory components, that renders the diminution in value in this case distinct from those cases involving non-perishable tangible property. In the non-perishable cases, the tangible property remains in existence and capable of use, although at diminished value. With perishable tangible property, the diminution in value is caused by the spoilation of the tangible property thereby rendering the property useless. The court therefore holds Wells's possible liability to Eskimo Pie could be based on "property damage," as that term is defined in the CGL coverage part of the Primary Policy. Thus, it is clear that the scope of the CGL coverage part of the Primary Policy covers Eskimo Pie's claim for damages for loss of use to tangible property.

 Wells also asserts that Pillsbury is claiming damages for loss of use of certain equipment at its Tulare plant, "shrink" damages for the destruction or loss of use of raw materials due to decreased production, and "qualification" damages for raw materials and components lost during "qualification" of alternative production facilities made necessary due to the explosion at the Wells plant. Although the precise nature of Pillsbury's "shrink" damages cannot be ascertained from the record presented, at minimum, a material question of fact has been generated by Wells that Pillsbury's "shrink" damages appear to mirror, at least in part, Eskimo Pie's loss of use damages to tangible property. Thus, summary judgment is inappropriate here with respect to Pillsbury's claim for "shrink" damages.[7]

### b. Exclusions to coverage

Travelers contends that several exclusions significantly limit the coverage for property damage. Because the court has already determined that certain coverage exists, with respect to the Eskimo Pie lawsuit, and that a material question of fact exists regarding coverage, with respect to Pillsbury's lawsuit, and, as discussed below, concludes that Travelers has a duty to defend Wells in the underlying lawsuits, the court believes that resolution of the other coverage issues is best left for determination following the resolution of the underlying lawsuits. Iowa law applies, but, admittedly, there is no case or statutory law in the State of Iowa which is applicable to the questions here. To determine the questions involved, this court would be required to declare the law of Iowa in a case of first impression. Under our judicial system, it is preferable that cases of first impression be decided by the highest tribunal of the state. It appears to the court that it is neither necessary nor desirable that the questions here involved be determined by this court at this time. If

---

7. The court notes that Travelers contends that two policy exclusions apply to the loss of use claims. Travelers relies on the "Business Risk/Impaired Property" exclusion contained in the policies. Under this exclusion, the policies exclude coverage for "property damage to impaired property or property that has not been physically injured, arising out of ...delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms." Defendants's App. at 114. This exclusion, however, is inapplicable to the loss of use claims because Wells faces claims for negligence as well as breach of contract by both Eskimo Pie and Pillsbury. Similarly, Travelers's reliance on the "contractual liability exclusion," is misplaced because this exclusion is inapplicable to tort claims against Wells for acts of negligence.

the underlying lawsuits result in a judgment of no liability on the part of Wells, it may not be necessary for this court in this case to determine the question presented to it. Moreover, it is also possible that between now and the time that final judgment is entered in the underlying lawsuits, the Supreme Court of Iowa will have rendered an opinion or opinions determinative of the questions raised here.

### 2. The Umbrella policy

The parties have reiterated the same arguments discussed above with respect to the Umbrella policy. Because the terms of the Umbrella policy are indistinguishable in any meaningful way from the terms of the CGL coverage part of the Primary Policy, the court's conclusions with respect to the CGL coverage part of the Primary Policy also are applicable to the Umbrella policy.

### E. Travelers's Duty To Defend Wells

Wells argues that Travelers had and continues to have a duty to defend it in the underlying lawsuits and seeks summary judgment on this issue. Travelers contends that it has no duty to defend Wells in the underlying lawsuits, in part, because the damages alleged in the underlying lawsuits do not constitute covered damages under the CGL coverage part of the Primary Policy or the Umbrella policy. Because the issue of whether Travelers had or has a duty to defend Wells is raised in Wells's motion for partial summary judgment, the court will examine Iowa law regarding an insurer's duty to defend one of its insureds.

### 1. An Insurer's general duty to defend

An insurer has a duty to defend whenever there is potential or possible liability to indemnify the insured based upon the facts appearing at the outset of the case. *First*

*Newton Nat'l Bank v. General Casualty Co. of Wis.*, 426 N.W.2d 618, 623 (Iowa 1988) (citing *McAndrews v. Farm Bureau Mut. Ins. Co.*, 349 N.W.2d 117, 119 (Iowa 1984)); *see also Yegge v. Integrity Mut. Ins. Co.*, 534 N.W.2d 100, 102 (Iowa 1995) (duty to defend whenever potential liability to indemnify based upon facts appearing at outset of the case; however, duty to defend and duty to indemnify are co-extensive duties in that there is no duty to defend unless there is a duty to indemnify); *Essex Ins. Co. v. Fieldhouse*, Inc., 506 N.W.2d 772, 774 (Iowa 1993) (noting that in analyzing the potential duty to defend, which is broader than the duty to indemnify, the appropriate starting point is the allegations contained in the petition); *Kartridg Pak Co. v. Travelers Indem. Co.*, 425 N.W.2d 687, 688 (Iowa Ct.App.1988) (to determine whether insurer had duty to defend, court construes the policy and looks to the pleadings and all other admissible and relevant facts in the record to determine whether coverage exists under the policy). Although courts should look first and primarily to the petition for the "facts at the outset of the case," it is sometimes necessary to expand the scope of inquiry to any other admissible and relevant facts in the record. *First Newton Nat'l Bank*, 426 N.W.2d at 623 (citing *McAndrews*, 349 N.W.2d at 119).

On the other hand, an insurer is not required to provide a defense when no facts presently available to it indicate coverage of the claim, merely because such facts might later be added by amendment or introduced as evidence at the trial. *McAndrews*, 349 N.W.2d at 119. Moreover, the Iowa appellate courts have noted that "[t]he insurer has no duty to defend if after construing both the policy in question, the pleadings of the injured party and any other admissible and relevant facts in the record, it appears the claim made is

not covered by the indemnity insurance contract." *Weber v. IMT Ins. Co.*, 462 N.W.2d 283, 285 (Iowa 1990) (quoting *McAndrews*, 349 N.W.2d at 119, in turn, citing *Central Bearings Co. v. Wolverine Ins. Co.*, 179 N.W.2d 443, 445 (Iowa 1970)). If the totality of facts fail to disclose potential coverage, an insurer might proceed in two ways: it could initiate a declaratory judgment action against its insured, or it might elect to do nothing, running the risk, of course, that its insured will seek indemnity if coverage is established at trial. *McAndrews*, 349 N.W.2d at 119 (citations omitted).

### 2. Travelers's duty to defend here

As noted above, the court has determined that Eskimo Pie has made a claim for a loss of use of tangible property and thus that there is coverage under the policies at issue. The court has also concluded that a material question of fact has been generated regarding whether Pillsbury's claim against Wells includes a claim for a loss of use of tangible property. Pillsbury's complaint clearly states that it is seeking to recover for "damage to [Pillsbury's] property..." Defendants's App. at 46.[8] Because the Pillsbury suit brought against Wells possibly seeks damages based on a physical injury to or a loss of use of tangible property, potential liability to indemnify Wells has been established and these liability policies require Travelers to defend Wells in the suits brought against it by Eskimo Pie and Pillsbury. *See Yegge*, 534 N.W.2d at 102; *Essex Ins. Co.*, 506 N.W.2d at 774; *First Newton Nat'l Bank*, 426 N.W.2d at 623; *McAndrews*, 349 N.W.2d at 119. It must be remembered that the potential duty to defend is broader than the duty to indemnify.

*Essex Ins. Co.*, 506 N.W.2d at 774. Therefore, the court grants this portion of Wells's motion for partial summary judgment.

### F. Wells's Bad Faith Claim

Travelers seeks summary judgment on Wells's claim of bad faith. Travelers asserts that because it has no obligation to defend or indemnify Wells, its denial of coverage and refusal to defend Wells was fairly debatable. Wells responds that at the time Travelers denied Wells's claim for a defense of the Eskimo Pie and Pillsbury lawsuits, Travelers had no reasonable basis for denying the request. Wells further argues that the facts surrounding its bad faith claim are in dispute between the parties making summary judgment inappropriate on this issue.

 The Iowa Supreme Court has recognized both "first-party" and "third-party" bad faith claims against insurers. *See Dolan v. Aid Ins. Co.*, 431 N.W.2d 790 (Iowa 1988). In *Kooyman v. Farm Bureau Mut. Ins. Co.*, 315 N.W.2d 30, 33–34 (Iowa 1982), the Iowa Supreme Court recognized the "third-party" variety of the tort—that is, a cause of action by a third party against an insurer asserting that the insurer acted in bad faith in its representation of its insured with regard to the third-party's claim against the insured's policy. *Kooyman*, 315 N.W.2d at 33–34. Later, in *Dolan*, the Iowa Supreme Court also recognized a "first-party" bad faith cause of action—that is, a cause of action by an insured against its insurer alleging that the insurer acted in bad faith in its treatment of the insured's insurance claim. *Id.* at 794; *see Johnson v. Farm Bureau Mut. Ins. Co.*, 533 N.W.2d 203 (Iowa 1995);

---

**8.** While Travelers has directed the court's attention to the affidavit of Richard Jensen for the proposition that Pillsbury is not asserting a claim for damage to tangible property, Jensen makes clear in his subsequently taken deposition that he did not contemplate loss of use damages when he executed his affidavit.

*Stahl v. Preston Mut. Ins. Ass'n*, 517 N.W.2d 201, 203 (Iowa 1994); *White v. Northwestern Bell Telephone Co.*, 514 N.W.2d 70, 77 (Iowa 1994).

 The Iowa Supreme Court has instructed that:

> To establish a first-party bad-faith claim, " 'a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.' " *Dolan v. Aid Ins. Co.*, 431 N.W.2d 790, 794 (Iowa 1988) (quoting *Anderson v. Continental Ins. Co.*, 85 Wis.2d 675, 690, 271 N.W.2d 368, 376 (1978)). A reasonable basis exists for denying insurance benefits if the claim is "fairly debatable" as to either matters of fact or law. *Id.*

*Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 396 (Iowa 2001); *see United Fire & Cas. Co. v. Shelly Funeral Home*, 642 N.W.2d 648, 657 (Iowa 2002); *Morgan v. American Family Ins. Co.*, 534 N.W.2d 92, 96–97 (Iowa 1995); *Stahl*, 517 N.W.2d at 201; *White*, 514 N.W.2d 70, 77 (Iowa 1994); *Wetherbee v. Economy Fire & Cas. Co.*, 508 N.W.2d 657, 661–62 (Iowa 1993); *Reuter v. State Farm Mut. Auto. Ins. Co.*, 469 N.W.2d 250, 253 (Iowa 1991); *Central Life Ins. v. Aetna Casualty & Surety Co.*, 466 N.W.2d 257, 263 (Iowa 1991); *Dirks v. Farm Bureau Mut. Ins. Co.*, 465 N.W.2d 857, 860 (Iowa 1991); *Kiner v. Reliance Ins. Co.*, 463 N.W.2d 9, 13 (Iowa 1990); *Dolan*, 431 N.W.2d at 794. The first element is objective, while the second is subjective. *Shelly Funeral Home*, 642 N.W.2d at 657. As to what is "fairly debatable," the Iowa Supreme Court observed,

> An insurance company has the right to challenge claims that are "fairly debatable" without being subject to a bad faith tort claim. [*Sampson v. American Stan-*

*dard Ins. Co.*, 582 N.W.2d 146, 150 (Iowa 1998) ]. Thus, when an objectively reasonable basis for denying a claim exists, the insurer cannot be held liable for bad faith as a matter of law. *Id.* The debate may involve a dispute concerning an issue of fact or law. *Id.* The reasonable basis for denying the claim, however, must exist at the time the claim is denied. *Id.*

*Seastrom v. Farm Bureau Life Ins. Co.*, 601 N.W.2d 339, 346 (Iowa 1999).

 In evaluating whether a reasonable basis for the denial existed, it is appropriate to determine whether a claim was properly investigated and whether the results of the investigation were subjected to a reasonable evaluation and review. *Dolan v. Aid Ins. Co.*, 431 N.W.2d 790, 794 (Iowa 1988). However, " '[i]n a first-party bad faith claim, "an imperfect investigation, standing alone, is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim." ' " *Seastrom*, 601 N.W.2d at 347 (quoting *Sampson*, 582 N.W.2d at 152, in turn quoting *Reuter v. State Farm Mut. Auto. Ins. Co.*, 469 N.W.2d 250, 254–55 (Iowa 1991)). "In fact, where an insurer has an objectively reasonable basis to deny coverage, it has no duty to investigate further before denying the claim." *Seastrom*, 601 N.W.2d at 347.

 In this case, Travelers has offered as what it believes to be an objectively reasonable explanation for its denial of Wells's claim. Applying the standards for evaluating this explanation found in the Iowa Supreme Court's decisions, the court must decide whether Travelers's decision regarding the Wells's claim was "fairly debatable" was based on the exercise of honest and informed judgment. *See Kiner*, 463 N.W.2d at 12. If a reasonable factfinder could conclude that the insurer

failed to exercise an honest and informed judgment in denying the claim, and thus, could conclude that the insurer's denial was not fairly debatable, a jury question is generated on Well's bad faith claim. *Id.*

The court concludes that neither the law in Iowa nor the law in other states is settled on the questions of coverage in this case. The best example of this is demonstrated by the arguments surrounding the owner property exception to coverage. The CGL coverage part of the Primary Policy provides that:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of … "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

Defendants's App. at 123. Travelers contends that the phrase "to which this insurance applies" creates a significant limitation on coverage for property damage. As the New Jersey Supreme Court recognized,

> The qualifying phrase, "to which this insurance applies" underscores the basic notion that the premium paid by the insured does not buy coverage for all property damage but only for that type of damage provided for in the policy. The limitations on coverage are set forth in the exclusion clauses of the policy, whose function it is to restrict and shape the coverage otherwise afforded.

*Weedo v. Stone–E–Brick,* 81 N.J. 233, 405 A.2d 788, 790 (1979).

Here, section j of the CGL coverage part excludes coverage for property damage to: "Property you own, rent, or occupy." Defendants's App. at 114. Travelers argues that this exclusion, the "owned property" exclusion, bars coverage here because any damages "because of" property damage to Wells's plant are not covered. Wells, in response, contends that the "owned property" exclusion does not apply to third-party liability claims.

While there are no decisions from the Iowa appellate courts discussing the effect of the "owned property" exclusion, decisions from a number of state and federal courts have examined the effect of the "owned property" exclusion. In support of its argument, that the "owned property" exclusion bars coverage here, Travelers directs the court's attention to the First Circuit Court of Appeals's decision in *American Home Assurance Co. v. Libbey–Owens–Ford Co.,* 786 F.2d 22 (1st Cir. 1986).

In *American Home Assurance Co.,* the defendant provided windows for a commercial building, which subsequently failed to conform to contract specifications and had to be replaced. *Id.* at 23. The owner of the building sued defendant, seeking damages which the court grouped into two categories: (1) claims for the immediate costs of removing and replacing the windows; and (2) consequential losses suffered by the building owner as a result of the need to replace the windows. *Id.* Among the consequential losses, the building owner asserted a claim for the loss of rentals and deprivation of use of the building for thirty-three months. *Id.* Defendant sought reimbursement for the cost of the settlement from plaintiff insurer, issuer of defendant's second layer excess policy. *Id.* at 24. Plaintiff, however, disclaimed coverage, and shortly before the settlement, filed an action seeking declaratory judgment that its policy did not cover any of the claims asserted by the building owner. *Id.* Plaintiff agreed to indemnify defendant for all sums it became obligated

to pay, by law or by agreement, "because of ... property damage as hereinafter defined." *Id.* The policy expressly excluded claims made against defendant for damage to defendant's own products for the improper performance or design of defendant's products.[9] *Id.* Plaintiff argued that these two exclusions qualified the definition of "property damage" under the policy to exclude coverage for all consequential damages arising from physical damage to defendant's own products. *Id.* at 26. Travelers notes that the First Circuit Court of Appeals observed that:

> The fact that consequential damages from property damage are covered under the post–1973 version of the Comprehensive General Liability Policy (CGLP) does not mean that all consequential damages are necessarily covered under that standard policy. The CGLP states that the insurer will pay all sums the insured becomes obligated to pay as damages "because of ... property damage to which this insurance applies". That policy then states "[t]his insurance does not apply ... to property damage to the named insured's products." Thus, as a leading commentator of the CGLP notes, such a policy would cover only consequential damages resulting from "property damage to which the policy applies", *Tinker*, supra at 254, and therefore consequential damages

arising from damage to the insured's own product, property explicitly excluded from the policy's application, would not be covered.

*Id.* at 26–27 (footnote omitted).

However, the court of appeals reversed the district court's granting of summary judgment in favor of the insurer, reasoning that: "neither of these provisions is sufficient to exclude coverage for all consequential damages arising from physical damage to an insured's product."[10] *Id.* at 27.

In response to Travelers's argument, Wells points the court to a line of cases, all but one of which involve environmental contamination, exemplified by the Seventh Circuit Court of Appeals's decision in *Patz v. St. Paul Fire & Marine Ins. Co.*, 15 F.3d 699 (7th Cir.1994). *See Anderson Dev. Co. v. Travelers Indem. Co.*, 49 F.3d 1128, 1135–36 (6th Cir.1995); *Joslyn Manuf. Co. v. Liberty Mut. Ins. Co.*, 23 F.3d 1212, 1214 n. 1 (7th Cir.1994); *King County v. Travelers Ins. Co.*, No. C94–1751Z, 1996 WL 257135, at *2 (W.D.Wash. Feb. 20, 1996); *Unigard Mut. Ins. Co. v. McCarty's, Inc.*, 756 F.Supp. 1366, 1369 (D.Idaho 1988); *see also Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049, 1055 (Ind. 2001). In these decisions, the courts have recognized an exception to the owned property exclusion where there is actual or

---

**9.** The specific language of the two exclusions were as follows:

"This policy does not apply ... (c) to claims made against the Insured:
(i) for damage to the Named Insured's products arising out of such products or any part of such products;
...
(iv) for improper or inadequate performance, design or specification, but nothing herein contained shall be construed to exclude claims made against the Insured for personal injuries or property damage (other than property damage to a product of the

Insured) resulting from improper or inadequate performance, design or specification."
*American Home Assurance Co.*, 786 F.2d at 24 n. 7.

**10.** In reaching this conclusion, the court of appeals did note that: "[U]nlike many other policies that follow the language of the Comprehensive General Liability Policy, there is no clause in the American Home policy that restricts consequential damages to property damage 'to which this insurance applies.' "
*Id.* at 28.

imminent harm to third-party property, including the state's environmental interest in maintaining air, soil and water quality.

In *Patz*, the Wisconsin Department of Natural Resources discovered groundwater and soil contamination on the premises of an insured engaged in the painting of farm equipment. The Department of Natural Resources ordered the removal of barrels of paint sludge together with soil surrounding the barrels and soil surrounding a related disposal pit. *Patz*, 15 F.3d at 702. The insureds sought to recover from their insurers clean up costs that were incurred because the state ordered the insureds to remedy soil and groundwater contamination on their property. The insurer refused to pay for this cleanup, arguing that the contamination affected only soil and groundwater within the boundaries of the insured's property and coverage was therefore barred by the owned property provision. Finding for the insureds, the court of appeals concluded that the owned-property exclusion set forth in the insurance policy did not bar coverage even though "to date the only contamination from the waste materials generated by the [Patzes'] painting operation is to soil and groundwater within the boundaries of the Patzes' own land." *Id.* at 705. The court held that the owned-property exclusion was inapplicable because, as the court characterized the suit, the insureds were "not seeking to recover for damage to their property," but rather, they were seeking "to recover the cost of the liability that the [state] imposed on them for maintaining a nuisance." *Id;* *see also Anderson Dev. Co. v. Travelers Indem. Co.*, 49 F.3d 1128, 1134 (6th Cir.1995) (following *Patz* under Michigan law).

Wells urges this court to follow the reasoning of *Patz*. While the *Patz* decision is understandable in light of its facts which depict a sympathetic insured who received erroneous advice from regulatory authorities, the decision in *Patz* has been widely criticized for its failure to analyze, or even acknowledge, the unambiguous language of the policies at issue. *See Martin v. State Farm Fire & Cas. Co.*, 146 Or.App. 270, 932 P.2d 1207, 1212 (1997) (declining to apply the reasoning of *Patz* because "the analysis of insurance coverage issues is based on the specific terms of the policies, not on the court's general concepts of what coverage various kinds of insurance should provide"); *E.I. du Pont de Nemours Co. v. Allstate Ins. Co.*, 686 A.2d 152, 157 (Del. 1996) (noting that the decision in *Patz* "ignores the clear and unambiguous language of the policies ... as well as the well-reasoned and predictable law regarding the construction of insurance policies"); *see also Hakim v. Mass. Insurers' Insolvency Fund*, 424 Mass. 275, 675 N.E.2d 1161, 1166 n. 11 (1997) (holding that the *Patz* decision was unpersuasive because it is inconsistent with the well-established rule of reading the policy as a whole "without according undue emphasis to any particular part over another").

Travelers notes that the *Patz* decision and those decisions following it involve claims related to environmental contamination. Wells responds that the district court decision in *King County v. Travelers Ins. Co.*, No. C94–1751Z, 1996 WL 257135, at *2 (W.D.Wash. Feb. 20, 1996), did not involve a claim of environmental contamination. In *King County,* four tiles falling from the roof of the Seattle Kingdome resulted in the owner of the facility being forced to close the facility. *Id.* at *1. As a result of the closure, King County was unable to honor the "use agreements" it had entered into with professional sports franchises who planned to use the Kingdome for their events. *Id.* King County filed suit seeking coverage for the liabilities it incurred to those users as a result of

the Kingdome's closure. The insurer denied coverage based on the "owned property" exclusion. The court held that the insurer could not rely upon the "owned property" exclusion because, on the record before it, the court could not assume that King County had received a copy of the insurance form containing the exclusion. *Id.* In dicta, the court went on to note that the "owned property" exclusion would "not preclude coverage." *Id.* at *2. The court reasoned that the "owned property" exclusion "does not apply to liabilities sustained by an insured as a result of third party losses." *Id.* at *4. The court's analysis was as follows:

> The reasoning of the environmental cases applies here as well. King County seeks neither compensation for the reduction in value of the Kingdome nor recovery of the costs of repair in their suit against Charter Oak. Rather, King County seeks coverage of payments that it is legally obligated to pay as a result of the alleged occurrence. Although the environmental context presents special policy concerns that are not present here, such as the importance of preventing further contamination, that does not make the purposive reasoning of the environmental cases less persuasive. Furthermore, Washington courts, which have not yet considered this issue, would find those cases persuasive. Washington has already followed the majority of jurisdictions in holding that environmental cleanup costs are "damages" within the meaning of a liability policy.

*Id.* at *3.

Travelers points out that while the factual situation presented in the *King County* case may significantly mirror the circumstances presented in this case, the court in *King County* did not address the significance of the phrase "to which this insurance applies" in limiting coverage for property damage.[11] Indeed, while the phrase "to which this insurance applies" appears in the policies at issue in several of the cases cited by Wells, *see Anderson Dev. Co.*, 49 F.3d at 1130; *King County*, C94–1751Z, 1996 WL 257135, at *2; *Unigard*, 756 F.Supp. at 1369, none of those decisions discusses the significance of that phrase with respect to the coverage for property damage.

Given the lack of controlling precedent, and the divergent positions taken by courts regarding the scope of the owned property exception, the court finds that a reasonable factfinder could not conclude that Travelers failed to exercise an honest and informed judgment in denying Wells's claim, and thus, the court concludes that Travelers's denial of coverage in this case was fairly debatable. Thus, the court concludes that Travelers has, as a matter of law, established that it had a reasonable basis for denying Wells's request for coverage and that Travelers defend it against the underlying lawsuits. Therefore, this portion of Travelers's motion for partial summary judgment is granted.

### G. Proper Defendants

Travelers's also seeks summary judgment on all counts as to defendants Travelers Insurance Company and defendant Travelers Property Casualty Corporation on the grounds that they were improperly named as defendants in this case when neither defendant issued either policy at issue in this litigation. Travelers contends that both the Primary Policy and the Umbrella Policy were issued by defendant Travelers Indemnity Company of Illinois.

---

**11.** The parties' briefs in *King County* reveal that the parties did not raise or discuss the phrase "to which this insurance applies" nor the effect this phrase has in creating a limitation on coverage for property damage.

In response, Wells asserts that it is not clear who wrote the policies. Wells also contends that both Travelers Insurance Company and Travelers Property Casualty Corporation made representations to Wells that forms the basis for Wells's promissory estoppel claim.

The court concludes that Travelers has met its "initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue" on its argument that Travelers Insurance Company and Travelers Property Casualty Corporation were improperly named as defendants to this action, *see Hartnagel*, 953 F.2d at 395, but that Wells, with respect to all but its promissory estoppel claim, has not designated "specific facts showing that there is a genuine issue for trial" on this argument, *see* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548, even viewing all the facts in the light most favorable to Wells and giving Wells the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348; *Quick*, 90 F.3d at 1377 (same). Rather, as a matter of law, neither Travelers Insurance Company nor Travelers Property Casualty Corporation were parties to either insurance policy. The policies themself clearly indicate that defendant Travelers Indemnity Company of Illinois is the only one of the three named defendants to this case listed as having executed the policies. Amended Compl., Ex. # 1 at 27, Ex. # 2 at 272. Although Wells points to the fact that "Travelers Property Casualty" appears in the headers on some pages of the policies and correspondence apparently came from the offices of Travelers Insurance Company and Travelers Property Casualty Corporation, these facts do not generate a genuine issue of material fact as to whether either Travelers Insurance Company or Travelers Property Casualty Corporation executed the policies at issue in this litigation. Wells does not direct the court's attention to anything in the record which would establish that either Travelers Insurance Company or Travelers Property Casualty Corporation was the insuring entity behind either of the policies. Therefore, the court grants Travelers's motion for partial summary judgment with respect to Wells's claims against Travelers Insurance Company and Travelers Property Casualty Corporation found in Counts I, II, III, IV, V, VII, and VIII.

■ This leaves only Wells's claim of promissory estoppel against Travelers Insurance Company and Travelers Property Casualty Corporation. Wells asserts that both Travelers Insurance Company and Travelers Property Casualty Corporation made representations to it that certain costs would be covered under the Business Income Policy. Wells directs the court's attention to correspondence from Executive General Adjuster Bill Schoenborn. The court notes that the correspondence in question is on "Travelers Property Casualty" stationary. Neither party has explained what, if any, position Schoenborn has with Travelers Insurance Company or Travelers Property Casualty Corporation. Viewing all the facts in the light most favorable to Wells and giving Wells the benefit of all reasonable inferences that can be drawn from the facts, *see Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348; *Quick*, 90 F.3d at 1377, the court concludes that Wells has generated a genuine issue of material fact with respect to Wells's claim of promissory estoppel against Travelers Insurance Company and Travelers Property Casualty Corporation. Therefore, this portion of Travelers's motion for partial summary judgment is denied.

### H. Appeal Of Magistrate's Order Denying Motion For Partial Stay

 Wells also appeals United States Magistrate Judge Paul A. Zoss's Order denying Wells's Motion For A Partial Stay. Wells seeks to "stay all fact discovery and stay adjudication of all legal issues other than those presented in the parties' cross-motions for summary judgment on the duty to defend." Wells argues that without a stay, Travelers's pursuit of the relief sought in this action will effectively undercut Wells's defense of the underlying actions and align the insurers with Pillsbury and Eskimo Pie in the underlying claims. Wells specifically contends that the denial of its motion was clearly erroneous and contrary to law in the following regards:

1. In failing to consider the well-established jurisprudence governing issues of indemnity in declaratory actions between an insurer and its insured.

2. In holding that Wells Dairy has not established prejudice which cannot be accommodated by other rulings and procedures in the present case.

3. In holding that granting Wells Dairy a partial stay would be inequitable to Defendants.

4. In holding that judicial efficiency and economy would not best be served by granting Wells Dairy's motion.

Wells's Mot. at 1–2.

 The issue of the appropriateness of staying declaratory relief actions concerning insurance coverage pending resolution of the underlying state cases is a question that is controlled by federal civil procedure. The power of a district court to stay an action pending on its docket is "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936). More specifically, district courts have discretion to dismiss or stay an action for declaratory judgment. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 288, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995).[12] However, that discretion is not unbounded. A decision to dismiss or stay must rest on "considerations of practicality and wise judicial administration." *Id.* at 288, 115 S.Ct. 2137; *see Allstate Ins. Co. v. Brown*, 920 F.2d 664, 667 (10th Cir.1990) (holding that district court was justified in refusing to stay insurer's declaratory judgment action pending outcome of state suit despite claim that the same issues existed in both state and federal cases); *Liberty Mut. Ins. Co. v. Foremost–McKesson, Inc.*, 751 F.2d 475, 477 ( 1st Cir.1985) (affirming district court's stay of case in which insurer sought declaratory judgment regarding its obligations under liability insurance policy pending outcome of state case where no federal issues were raised in declaratory judgment action and "no federal interest would be served by retaining jurisdiction over the case.").

 In support of its motion, Wells relies extensively on the decision in *Mont-*

---

**12.** In *Wilton*, the Supreme Court held that the factors previously enumerated in its decision in *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 495, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942), continue to govern district courts' decisions to stay declaratory judgment actions. *Wilton* affirmed that, in determining whether to stay a declaratory judgment action, district courts should examine the following factors enumerated in *Brillhart:* (1) whether the claims of all parties can be satisfactorily adjudicated in the state proceeding; (2) whether the necessary parties have been joined in the state proceeding; and (3) whether such parties are amenable to process in the state proceeding. *Wilton*, 515 U.S. at 282, 115 S.Ct. 2137.

*rose Chem. Corp. of California v. Superior Court,* 6 Cal.4th 287, 861 P.2d 1153, 24 Cal.Rptr.2d 467 (1993). While *Montrose* is a state court decision, the court finds it instructive on the question of whether to grant a stay in this case. In *Montrose,* the insured brought an action against its insurers, seeking a declaratory judgment regarding the insurers' duty to defend the insured in an underlying third-party lawsuit. *Montrose,* 6 Cal.4th at 291, 861 P.2d at 1154, 24 Cal.Rptr.2d at 468. The court concluded that the insured had made a *prima facie* showing that the complaint in the underlying action fell within the coverage of the various policies. *Id.* at 304–05, 24 Cal.Rptr.2d 467, 861 P.2d 1153, 861 P.2d at 1163–64, 24 Cal.Rptr.2d at 477–78. Although the *Montrose* decision was primarily concerned with the determination of the insureds' duty to defend, the court commented on the timing of the resolution of indemnity issues in a related coverage case. The court explained that a stay of a declaratory relief action is "appropriate when the coverage question turns on facts to be litigated in the underlying action" because otherwise, "inconsistent factual determinations" could prejudice the insured. *Id.* at 301, 24 Cal.Rptr.2d at 476, 861 P.2d at 1162. The court noted by way of example that when a third party seeks damages on account of the insured's negligence, and the insurer seeks to avoid providing a defense by arguing that its insured harmed the third party by intentional conduct, "the potential that the insurer's proof will prejudice its insured in the underlying litigation is obvious." *Id.* In contrast, the court noted, when "the coverage question is logically unrelated to the issues of consequence in the underlying case, the declaratory relief action may properly proceed to judgment." *Id.* As an example, the court cited a case where the "question whether the owner had granted permission for the driver's use of the car

was irrelevant to the third party's personal injury claim, and could properly be determined in the declaratory relief action independently of the timing of the third party suit." *Id.* (citing *State Farm Mut. Auto. Ins. Co. v. Flynt,* 17 Cal.App.3d 538, 95 Cal.Rptr. 296 (1971)).

Following its *Montrose* decision, the California Court of Appeals considered, in a related case, whether another declaratory relief action filed by Montrose Chemical Corporation could be set for trial before the third-party suits were resolved. *Montrose Chem. Corp. v. Superior Court,* 25 Cal.App.4th 902, 31 Cal.Rptr.2d 38 (1994) ("Montrose II"). In *Montrose II,* the court noted that the question before it was "whether the coverage questions [were] logically unrelated, (that is, irrelevant) to the issues of consequence in the contamination cases so that they could be determined in the declaratory relief action without prejudice to Montrose in the underlying actions." *Id.* at 908, 31 Cal. Rptr.2d at 42. The California Court of Appeals also noted that when courts discuss "prejudice to the insured from concurrent litigation of the declaratory relief and third party actions," courts are indicating that "the insurer must not be permitted to join forces with the plaintiffs in the underlying actions as a means to defeat coverage." *Id.*; 31 Cal.Rptr.2d at 43. The court further noted that another prejudice is seen when the "insured is compelled to fight a two-front war, doing battle with the plaintiffs in the third party litigation while at the same time devoting its money and its human resources to litigating coverage issues with carriers." *Id.* Finally, the court observed that "there is the collateral estoppel issue," and explained that:

> [i]f the declaratory relief action is tried before the underlying litigation is concluded, the insured may be collaterally estopped from relitigating any adverse

factual findings in the third party, action, notwithstanding that any fact found in the insured's favor could not be used to its advantage.

*Id;* 31 Cal.Rptr.2d at 43.

The court then remarked that, "the trial court must [also] consider the burden on the carriers." *Id.* at 910, 31 Cal.Rptr.2d at 43. The court observed that given their duty to defend, the insurers pay for defense costs and "must continue to pay until the underlying actions are resolved unless, of course, they are allowed to litigate the indemnity issues." Id.; 31 Cal.Rptr.2d at 43. The court commented that in a case where there is no potential conflict between the coverage issues and those in the third-party action, the insurer may "obtain an early trial date in the coverage action and, if it wins, that is the end of its duty to defend." *Id.* Where, however, that cannot be done, "the carrier gets to keep paying and paying and paying." *Id.* Thus, the California Court of Appeals concluded that the "trial court should not hesitate to fashion orders which attempt to balance these conflicting concerns." *Id.* Thus, in the *Montrose* cases the courts accepted the notion of staying the coverage case until resolution of the underlying issues in the third-party action.

Under the circumstances presented here, the court concludes that the appropriate action is for this court to stay further proceedings in this case. The court finds it particularly significant that certain coverage issues raised in this case turn on facts that have yet to be litigated in the underlying actions. Thus, a stay is warranted to protect Wells from being prejudiced by inconsistent factual determinations. Moreover, if this case is not stayed and open discovery process proceeds, that discovery poses the risk of undermining possible defenses Wells might have against Pillsbury and Eskimo Pie. After the underlying actions have been finally decided,

either Wells or Travelers may move to lift the stay and proceed to litigate the duty to indemnify issues. The court notes that counsel for Travelers mentioned at oral argument the danger of evidence being lost due to the passage of time. To lessen that danger, either party may make application to the court to lift the stay for the limited purpose of preserving any evidence which is in peril of being lost. Therefore, Wells's Appeal Of Magistrate's Order Denying Motion For Partial Stay is granted. Because the court has granted Wells's motion to stay, its alternative motion to bifurcate is denied as moot.

### III. CONCLUSION

The court concludes that Eskimo Pie has made a claim for a loss of use of tangible property and thus that there is coverage under the policies at issue. The court also concludes that a material question of fact has been generated regarding whether Pillsbury's claim against Wells includes a claim for a loss of use of tangible property. Therefore, this portion of Travelers's motion for partial summary judgment is denied. The court further concludes that resolution of the other coverage issues is best left for determination following the resolution of the underlying lawsuits. The court next determines that potential liability to indemnify Wells has been established and these liability policies require Travelers to defend Wells in the suits brought against it by Eskimo Pie and Pillsbury. Therefore, the court grants this portion of Wells's motion for partial summary judgment. The court also concludes that Travelers has, as a matter of law, established that it had a reasonable basis for denying Wells's request for coverage and that Travelers defend it against the underlying lawsuits. Therefore, this portion of Travelers's motion for partial summary judgment is granted. The court further concludes that, as a matter of law, neither Travelers

Insurance Company and Travelers Property Casualty Corporation were parties to either insurance policy. Therefore, the court grants Travelers' motion for partial summary judgment with respect to Wells's claims against Travelers Insurance Company and Travelers Property Casualty Corporation found in Counts I, II, III, IV, V, VII, and VIII. However, the court concludes that Wells has generated a genuine issue of material fact with respect to Wells's claim of promissory estoppel against Travelers Insurance Company and Travelers Property Casualty Corporation. Therefore, this portion of Travelers's motion for partial summary judgment is denied. Finally, the court grants Wells's Appeal Of Magistrate's Order Denying Motion For Partial Stay. After the underlying actions have been finally decided, either Wells or Travelers may move to lift the stay and proceed to litigate on the duty to indemnify issues. Wells's alternative motion to bifurcate is denied as moot.

**IT IS SO ORDERED.**